**SECOND DIVISION**
**MILLER, P. J.,**
**RICKMAN and REESE, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

June 20, 2019

# In the Court of Appeals of Georgia

A19A0248. STELLY v. WSE PROPERTY MANAGEMENT, LLC.

RICKMAN, Judge.

In this trip-and-fall suit against a property owner and the property management company, the trial court denied the owner's motion for summary judgment but granted summary judgment to the property management company. Nelda Stelly, the plaintiff below, appeals, arguing that the management company had sufficient control of the premises to owe her a duty to keep the premises safe, as well as a duty to warn her about the unsafe handicap ramp upon which she tripped. For the following reasons, we reverse.

"Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. We apply a de novo standard of review and view the evidence in the light most favorable to the

non-movant." (Citations and punctuation omitted.) *Lawyers Title Ins. Corp. v. Griffin*, 302 Ga. App. 726, 727 (691 SE2d 633) (2010).

So construed, the evidence shows that in November 2012, approximately 11 months after moving into a Cambridge Downs apartment, Stelly, then age 60 and allegedly suffering a disability,[1] decided to walk to the mail kiosk at the apartment complex for the first time, rather than drive. She walked down the street then onto the sidewalk where a curb cut/wheelchair ramp allowed handicap access to the sidewalk. As she approached, Stelly saw the ramp, but after at least one step up the ramp, she tripped and fell. She does not know what her foot got caught on, whether she tripped with her left or right foot, or how many steps she took going up the ramp before she tripped. The fall damaged Stelly's spinal cord, and, at the time of her deposition, she could not walk. No one witnessed Stelly's fall.

Six years before Stelly's fall, in an effort to purchase the Cambridge Downs apartment complex, Ronald Mullin hired an engineering firm to examine the property. The firm concluded, among other things, that the wheelchair ramp located on the sidewalk near the mail kiosk was "steeper than allowed" or "steeper than the allowed

---

[1] Stelly alleged that, at the time, she was "legally disabled due to health issues secondary to an aortic aneurysm she suffered in 2008." She testified that she had no issues with walking even with that condition.

1 in 12 [grade]."[2] Mullin died just prior to closing, but his estate, acting through two LLCs and their manager/trustees who live in California,[3] eventually purchased Cambridge Downs; the new owners were aware of the ramp problem.

In May 2006, the new owners entered into a written Property Management Agreement (the "Agreement") with the predecessor in interest of WSE Property Management LLC ("Worthing"). Worthing drafted the Agreement. At the time, Worthing was aware of the engineering report, including the need to correct the grade issue of the handicap ramp, through direct conversations with the engineer. In fact, Worthing's former regional service director averred that he knew the ramp was too steep, and, in his opinion, "it constitute[d] a trip hazard." The owners and Worthing sometimes referred to the ramp problem as one of the "ADA Issues" at the property.

---

[2] Although the engineer did not state in his report what rule or regulation required a lower grade, during the present litigation, experts have opined that the handicap ramp as installed violated certain laws, including the Fair Housing Act, the Americans with Disabilities Act (ADA), and the Georgia Accessibility Code, as well as related American National Standards Institute standards, because the ramp's slope was too steep, the ramp's slope was "non-planar," the ramp posed a "camouflaged trip hazard," and it lacked "coloration, texturization, or written warnings."

[3] One trustee never set foot on the property; the other visited on only one occasion.

Under the Agreement, the owners hired Worthing "to manage the Property on the terms in this Agreement," provide an on-site property manager, and maintain a "Property Management Office" on site, open 9 a.m. to 6 p.m. on weekdays and 1 to 5 p.m. on weekends, for "management and operation functions pertaining to the Property." Worthing was also required to prohibit "the use of the Property for any purpose which might impair any policy of insurance on the Property . . . or which would be in violation of any applicable law." The president of Worthing testified that "the Property Management Agreement . . . allots to us the authority to hold the property out for rent, collect rents, and deliver those rents after the agreement of expenses to the owner, [and] to run the property in accordance with the annual budget that's approved by the owner."

In addition, the Agreement obligated Worthing to "use diligent efforts to maintain, at Owner's expense, the building, appurtenances and grounds of the Property in good condition and repair in accordance with standards established by Owner in writing from time-to-time, including interior and exterior cleaning, painting and decoration, plumbing, carpentry and such other normal maintenance and repair work"; "make arrangements for all utilities, services, equipment and supplies necessary or desirable or requested by Owner for the management, operation,

4

maintenance and servicing of the Property"; and take such action as may be necessary to comply with any and all laws applicable to the Property."

Nevertheless, the Agreement specifically exempted Worthing from the obligation of performing "any major capital improvements," and it significantly limited Worthing's authority to incur expenses. Specifically, the Agreement provided that Worthing was only authorized to incur expenses if they were included in a budget approved by the owner, and for expenses greater than $2,000, the owner's specific written authorization was also required:

> Approval of a Budget by Owner shall not constitute authorization for Manager to expend any money except as specifically set forth herein. Except as specifically authorized herein, Manager will obtain Owner's specific written authorization before making any expenditure of Owner's funds. . . . [T]o the extent set forth in the most recent Budget approved by Owner, . . . Manager will pay each and every expense properly incurred in the ordinary course of managing the Property not in excess of $2,000 for any single repair, purchase, or other expense, it being understood that Manager shall obtain Owner's specific written authorization prior to paying for any individual item of expense which exceeds $2,000.

The expenditure authorization provision concludes, "[n]otwithstanding the foregoing, if emergency action is necessary to prevent damage to the Property or danger to

5

persons, Manager may incur such expenses as are reasonable necessary without the prior written approval of Owner to protect the Property or persons."[4]

In addition, the Agreement provides that Worthing's "status" under the Agreement "is that of an independent contractor and not as an agent or employee of Owner," and that nothing in the agreement "shall inure to the benefit of any third party." Finally, the owners expressly retained all rights of ownership:

> Nothing in this Agreement shall be deemed to limit Owner's right to do anything regarding the Property which an Owner of the Property would otherwise be entitled to do, including but not limited to the right to enter upon the Property, to inspect the Property, to perform any repair or maintenance thereof, and to do anything required of Manager hereunder if Manager fails to do so in Owner's opinion.

On several occasions between 2006 and 2012, when Stelly fell, Worthing had requested that the owners approve expenses that included the necessary repairs to the

---

[4] The issue of whether the handicap ramp required "emergency action" under the Agreement does not appear to have been raised in the trial court, and, other than mentioning the clause on appeal, Stelly has not offered any argument or citation to authority regarding the emergency clause. Nevertheless, "a court should construe a contract in its entirety and not merely by examining isolated clauses and provisions thereof." (Citation and punctuation omitted.) *Pfeiffer v. Dept. of Transp.*, 250 Ga. App. 643, 646 (1) (551 SE2d 58) (2001). Even so, our conclusion below would be the same notwithstanding the emergency clause in the Agreement.

6

handicap ramp, but the owners never approved them. For example, in October 2006, Worthing submitted bids for a collection of jobs, including repair of the handicap ramp.[5]

In granting summary judgment to Worthing, the trial court found, among other things, that Worthing did not contest that it had actual knowledge of the alleged hazard; that despite Worthing's requests to the owners for authorization to repair the ramp, it never received approval; that there is no evidence of a stand-alone bid of less than $2,000 to repair the handicap ramp; and that, therefore, the undisputed evidence showed that Worthing did not have authority to repair the ramp at issue. The court also found that Stelly was not a third-party beneficiary to the Agreement. Stelly appeals and contends the trial court erred by failing to recognize that Worthing owed a duty to keep the premises safe and to warn of a known danger.[6]

---

[5] Although a line item on one bid listed the cost of correcting the ramp at $1,468.50, the price was "contingent on doing all the items that were bid." Two other bids showed costs to repair the "concrete" of more than $2,000.

[6] In her complaint, Stelly filed claims of negligent maintenance, inspection, and repair; failure to adequately hire, retain, train or supervise employees; nuisance; negligence under OCGA § 51-3-1; and negligence per se. The trial court granted complete summary judgment for Worthing. On appeal and at oral argument, however, Stelly has only asserted that the trial court erred with regard to her claim under OCGA § 51-3-1 and the related duty to warn.

1. In Georgia, owners or occupiers of land have a statutory duty "to exercise ordinary care in keeping the premises and approaches safe." OCGA § 51-3-1. A contractor can obtain the status of an occupier if it takes control of the premises. See *Ramcke v. Georgia Power Co.*, 306 Ga. App. 736, 739 (3) (703 SE2d 13) (2010); *Bartlett v. Holder Const. Co.*, 244 Ga. App. 397, 399 (535 SE2d 537) (2000). In that case, the contractor assumes the duty to keep the premises safe, and the owner may then owe no such duty if he or she has surrendered complete possession and control to the contractor. *Ramcke*, 306 Ga. App. at 739 (3); *R & S Farms v. Butler*, 258 Ga. App. 784, 786 (575 SE2d 644) (2002). The same rules apply when an owner/occupier surrenders possession and control of a portion of the property. See *Nair v. Aramark Food Serv. Corp.*, 276 Ga. App. 793, 795 (625 SE2d 78) (2005). "As to that portion, the contractor incurs a duty to exercise ordinary care toward keeping the property safe." *Bartlett*, 244 Ga. App. at 399.

In this setting, possession of property, i.e., custody and control, "may be defined as having personal charge of or exercising the rights of management or control over the property in question." *Towles v. Cox*, 181 Ga. App. 194, 196 (1) (351 SE2d 718) (1986); see also *Hess v. Textron Auto. Exteriors*, 245 Ga. App. 264, 265 (2) (536 SE2d 291) (2000). Whether the owner has surrendered possession and

8

control is generally a question of fact. See, e.g., *Carpenter v. Sun Valley Properties, LLC*, 285 Ga. App. 1, 2 (645 SE2d 35) (2007); *Nair*, 276 Ga. App. at 795. The relevant facts can include the terms of any contract between the owner and the contractor, see, e.g., *Ramcke*, 306 Ga. App. at 739 (3); *Nair*, 276 Ga. App. at 795, as well as the surrounding circumstances and course of dealings between the parties that reveal the relative possession and control of the property by the parties. See, e.g., *Bartlett*, 244 Ga. App. at 399 (considering circumstances such as that the contractor posted its sign at the construction site, maintained a fence along the perimeter of the site, controlled access to the site, and provided night-time security at the site).

Here, aspects of the Agreement suggest that Worthing had not assumed full possession and control of the premises. Although the Agreement gave Worthing the duty to keep the property in good condition and repair, the owners were responsible for standards in that regard. Although the Agreement required Worthing to comply with any and all laws applicable to the property, the owners retained control over the repair process by limiting Worthing's authority to spend the owners' money on repairs. On several occasions, Worthing requested that the owners approve repairs to the handicap ramp, but the owners failed to do so. Finally, the Agreement provides that the owner retained all rights of ownership: "Nothing in this Agreement shall be

9

deemed to limit Owner's right to do anything regarding the Property which an Owner of the Property would otherwise be entitled to do."

But some aspects of the agreement suggest that Worthing had partial possession and control of the apartment complex. Whereas the trustee/owners lived in California and rarely visited, Worthing physically occupied the premises in that it was required to maintain a property management office onsite open seven days a week and operated by a property manager. Worthing was also charged with ensuring that the premises was not used for improper purposes or in violation of the law. And Worthing was required to take emergency action if necessary to prevent damage to the Property or danger to persons, even if such action required Worthing to incur expenses, without the owners' prior written approval. See generally *Scheer v. Cliatt*, 133 Ga. App. 702, 704 (2) (a) (212 SE2d 29) (1975) (aspects of control include: "Who managed the daily operations of the shop-hiring, wages, hours, etc.? Who had the right to admit or exclude customers? Who maintained and repaired the premises? Who paid the bills, taxes, wages? What were the responsibilities of the parties under the lease? Etc.").

Furthermore, the owners testified that Worthing had some authority to act even without the owners' approval for something that was "inherently hazardous" and that

10

Worthing could "pick[ ] out [of a bid] things to do without our approval if they deemed it necessary." For example, evidence was presented that the owners gave Worthing "implicit authority" to pay for a pool drain repair that was required by a change in the law. Correspondence from Worthing to the owners about the drain repair stated,

> FYI. . . A new law for the swimming pools went into effect. A new drain cover has to be installed on the bottom of the pool. . . . The cost will range from $800 to $1,300. I just wanted to give you a heads up. This was not anticipated in the 2009 budget but we will look for ways to offset this unexpected expense.

Thus, some evidence was presented to suggest that Worthing and the owners strayed from the spending authorization process found in the Agreement. Cf. *Nelson v. Jones*, 220 Ga. App. 685, 687 (3) (469 SE2d 863) (1996) (factual issue re: whether parties mutually agreed to depart from terms of agreement).

In sum, we conclude that there is an issue of fact as to whether Worthing was in control of the handicap ramp to the degree necessary to impose on Worthing the duty to keep the premises safe found in OCGA § 51-3-1, including the duty to warn,[7] as an occupier of the premises. See, e.g., *Nair*, 276 Ga. App. at 795 (issue of fact as

---

[7] See infra n. 9.

11

to whether contract between food service provider and owner provided that food service provider assumed control over the table at which plaintiff fell); see also *Sharp-Boylston Co. v. Bostick*, 90 Ga. App. 46, 49 (81 SE2d 853) (1954) (quoting the Restatement of the Law, Agency, Vol. II, § 355: "An agent who has the custody of land or chattels and who should realize that there is an undue risk that their condition will cause harm to the person, land, or chattels of others is subject to liability for such harm caused, during the continuance of his custody, by his failure to use care to take such reasonable precautions as he is authorized to take. One who is in complete control over either land or chattels is under the same duty to protect others from the condition of such things as is the possessor of land or chattels. The custodian in complete charge is not excused from liability by the fact that he is acting for the benefit of another. He is subject to the same liability and has the same immunities as the possessor."); compare Restatement (Second) of Agency § 355 (1958), comment b ("Limited control. If an agent has only a limited control over land or chattels, he is subject to liability only to the extent that he is authorized to exercise such control. Thus, an agent who is employed to have general oversight over a building, but who is not authorized to cure defects in it, is under no liability to third persons, unless, by his conduct, he causes them to be in its vicinity.").

Under the present circumstances, whether the owners, Worthing, or both were in control of the handicap ramp presents an issue of fact. See, e.g., *Little v. Liberty Savings Bank*, 191 Ga. App. 732, 733 (382 SE2d 734) (1989) (whether owner or carpeting contractor, or both, had control of hallway where plaintiff fell presented an issue of fact). The trial court therefore erred by concluding that Worthing owed no duty to Stelly under OCGA § 51-3-1 as a matter of law.[8]

2. Worthing argues that even if it could be considered an occupier, it had no duty to warn Stelly of any defect in the ramp because the ramp's slope or grade was open and obvious and Stelly therefore knew or should have known of the ramp's grade. See *McLemore v. Genuine Parts Co.*, 313 Ga. App. 641, 644 (722 SE2d 366) (2012) (no duty to warn of an open and obvious hazard).[9]

---

[8] We have carefully considered Worthing's argument that Stelly invited an error by the trial court. Stelly initially informed Worthing that it would not oppose Worthing's motion for summary judgment, yet she latter opposed the motion, and Worthing may have relied, to some degree, on that representation. But a review of the trial court's order shows that although the court mentioned the incident, it addressed the merits of Stelly's claims without relying on the incident.

[9] This duty to warn is not a separate basis for liability from OCGA § 51-3-1. Rather, failure to warn is simply a means by which an owner or occupier might have breached a duty of care it owed under a theory of premises liability. See *Tomsic v. Marriott International*, 321 Ga. App. 374, 385 (4) (739 SE2d 521) (2013), and cases cited therein. See also *McLemore*, 313 Ga. App. at 644.

"[I]n order to recover for injuries sustained in a slip-and-fall action, an invitee must prove (1) that the defendant had actual or constructive knowledge of the hazard; and (2) that the plaintiff lacked knowledge of the hazard despite the exercise of ordinary care due to actions or conditions within the control of the owner/occupier." *Robinson v. Kroger Co.*, 268 Ga. 735, 748 (2) (B) (493 SE2d 403) (1997). But

> [w]here the case involves a static dangerous condition, the rule is well established that the basis of the proprietor's liability is his superior knowledge and if his invitee knows of the condition or hazard there is no duty on the part of the proprietor to warn him and there is no liability for resulting injury because the invitee has as much knowledge as the proprietor does.

(Citation and punctuation omitted.) *Powell v. Woodridge Condo. Assoc.*, 206 Ga. App. 176, 177 (424 SE2d 855) (1992).

Nevertheless, under *Robinson v. Kroger*, the plaintiff is not required to show that she lacked knowledge of the hazard "until the defendant establishes negligence on the part of the plaintiff—i.e., that the plaintiff intentionally and unreasonably exposed self to a hazard of which the plaintiff knew or, in the exercise of ordinary care, should have known." *Robinson*, 268 Ga. at 748 (2) (B); see also *American Multi-Cinema v. Brown*, 285 Ga. 442, 445 (2) (679 SE2d 25) (2009).

14

Here, prior to Stelly's fall, the owners and Worthing were aware that the ramp at issue was too steep and did not comply with the ADA. And Worthing's former regional service director knew that the ramp was too steep, and, in his opinion, "it constitute[d] a trip hazard." Thus, the first prong of *Robinson* is established. The next question, therefore, is whether Worthing established that Stelly intentionally and unreasonably exposed herself to a hazard. Id.

Although it is clear from Stelly's testimony that she was aware that there was a ramp and that she intentionally proceeded up the ramp, it is not clear that she appreciated the hazard. This Court has held that a handicap access ramp, "can be dangerous to third persons if made or installed in a negligently defective manner." *Hollis & Spann v. Hopkins*, 301 Ga. App. 29, 33-34 (2) (686 SE2d 817) (2009); see also *Anderson v. Turton Development*, 225 Ga. App. 270, 271-273 (1) (483 SE2d 597) (1997) (same even though plaintiff who fell on ramp was not handicapped or elderly). And here, an expert has opined that the ramp constituted a trip hazard because it had a "non-planar" grade, that is, an uneven grade, i.e., a greater slope toward the right side of the ramp than the left side. The expert explained, "with these uneven surfaces, . . . non-planar . . . surfaces, it doesn't take much of an irregularity to be a trip hazard." He testified, "it's very well documented that if you present

15

people with nonstandard walking surfaces with irregularities in them . . . that the likelihood of slips, trips, and falls will significantly increase." Finally, he testified that even if she saw the ramp before walking up it, "I do not think she would have had an appreciation for what I'm calling the nonstandard nature of that ramp, and that would be both the -- the average slope of the -- the flare ramp on the side or the irregular nature of it, the non-planar nature of it." He added, "visually, the scene doesn't present itself as any obvious hazard."

Based on this testimony regarding a hidden danger, cases where summary judgment was appropriate because the plaintiff chose to step on an obvious defect are distinguishable. See, e.g., *McLemore*, 313 Ga. App. at 644 (although higher than normal curb did not comply with building code requirements, because plaintiff "was able to see the curb, including its height, as she approached it," the curb was an obvious static condition); *Becton v. Tire King of North Columbus*, 246 Ga. App. 57, 59 (539 SE2d 551) (2000) (a large planter is a static condition that "does not change and is dangerous only if someone fails to see it and walks into it"). Compare *Poythress v. Savannah Airport Commission*, 229 Ga. App. 303, 305 (3) (494 SE2d 76) (1997) (in a case where no expert or other evidence showed flaws in the design or construction of a handicap ramp, and the plaintiff chose to walk up the ramp, any

16

hazard associated with the ramp was open and obvious) (physical precedent only); *Warnke v. Pace Membership Warehouse*, 215 Ga. App. 33, 33 (449 SE2d 629) (1994) (plaintiff's injuries arose from the reduced visibility created by fog, not curb upon which she tripped; expert testimony that curb presented trip hazard was not beyond ken of jury).

For the above reasons and in light of our Supreme Court's reminder that "the negligence of the defendant and the plaintiff[ ] and the plaintiff's lack of ordinary care for personal safety are generally not susceptible of summary adjudication," *Robinson*, 268 Ga. at 748 (2) (B), we conclude that there is an issue of fact as to whether Stelly exposed herself to an open and obvious hazard. See, e.g, *Davis v. GBR Properties*, 233 Ga. App. 550, 551-552 (1) (504 SE2d 204) (1998) (combined with improper handrails, dangers of too-steep ramp are not as obvious as that posed by a hole in the ground); *Anderson*, 225 Ga. App. at 271-273 (1) (question of fact as to whether handicap ramp that failed to comply with American National Standards Institute standards for handicapped persons created a dangerous condition even though plaintiff who fell on ramp was not handicapped or elderly); see also *Pippins v. Breman*, 152 Ga. App. 226, 228 (262 SE2d 477) (1979) ("[T]here is a difference

between mere knowledge of a defect and full appreciation of the risk involved.") (punctuation omitted).

For the above reasons, we hold that the trial court erred by granting summary judgment to Worthing on Stelly's claim under OCGA § 51-3-1.[10]

*Judgment reversed. Miller, P. J., and Reese, J., concur.*

---

[10] We also reverse the court's holding that certain related motions by Worthing were moot because summary judgment was being granted.